BLAKE, Respondent, vs. JOHNSON, Appellant.

*April 3—May 1, 1923.*

*Trusts: Termination: Degree of proof required to establish: Evidence: Sufficiency.*

1. In an action to impress a trust on real property, where it is conceded that the holder of the legal title at one time held an undivided half interest in the property as trustee for another, it is incumbent on such trustee to show by clear and satisfactory evidence that his trusteeship was terminated as against the beneficiary.
2. The evidence in this case is *held* to show that, though a trust in real property existed at the inception of the title, it had been terminated by an express oral agreement wherein the trustee agreed to support and care for the beneficiary during her lifetime, which agreement had been performed by the trustee.

APPEAL from a judgment of the circuit court for Milwaukee county: E. C. HIGBEE, Judge. *Reversed.*

This action was brought by the plaintiff to compel the defendant to convey to her certain real estate which, it is alleged, is held by him in trust for the plaintiff, and for an accounting of the rents and profits thereof.

In 1882 the plaintiff was divorced from her husband, Barnum Blake, by decree of the circuit court for Milwaukee county. By that decree she was awarded alimony in the sum of' $2,000. In the year 1884 the plaintiff and the defendant entered into an agreement for the establishment of a home in common in the city of Milwaukee and, for a time thereafter, the household consisted of the plaintiff, her aged invalid father, the defendant, his younger brother and two younger sisters. The plaintiff's father died in 1892. The defendant's brothers and sisters, upon reaching majority, drifted from the household and, after the death of plaintiff's father in 1892, plaintiff and defendant continued to live together and maintain their household down to the latter part of 1915. Plaintiff was about twenty years older than the defendant, and the relations maintained between them during all this time were akin to those of mother and son.

In 1885 the defendant discovered, by chance, that plaintiff's divorced husband was the owner of valuable property in the city of Chicago. He communicated this fact to the defendant and expressed the belief that she had not been justly dealt with, with reference to property matters, in the divorce action. It was agreed between them that the defendant should undertake an investigation, and that if any further allowance in the way of additional alimony should be eventually recovered from Barnum Blake it should be divided equally between plaintiff and defendant. As a result of plaintiff's efforts the divorce decree was modified by awarding to her $30,000. An appeal from the order granting the motion to modify the judgment was considered by this court

and will be found reported in *Blake v. Blake,* 68 Wis. 303, 32 N. W. 48.   An action was brought upon this judgment in the courts of Illinois, and upon the judgment entered thereon in the Illinois courts an execution was issued and certain dock property owned by Barnum Blake in the city of Chicago was sold on execution.   A certificate of sale was issued to *Mrs. Blake.*   Before the redemption period expired she assigned the certificate of sale to *Martin Johnson,* and a sheriff's deed thereon, in due course and on the 10th day of October, 1893, was issued to *Martin Johnson.*   It is conceded that by virtue of this transaction *Johnson* became the owner in fee of an undivided one-half interest in the property, and that he held title to the other undivided one-half interest as trustee for *Mrs. Blake.*

In 1905 the defendant traded said dock property for an apartment building in the city of Chicago, taking title in his own name, the latter being one of the pieces of real estate involved in this action.   Shortly after acquiring title to the dock property in Chicago defendant purchased a home in Milwaukee.   Plaintiff claims that this home was paid for with her money; that *Johnson* holds the title thereof as trustee for her benefit, and seeks to have title thereto vested in her.   The apartment building in Chicago and the home in Milwaukee are the parcels of real estate affected in this action.

The circuit court found that the defendant held the title to an undivided one-half of the apartment property as trustee for *Mrs. Blake* and decreed a conveyance thereof by *Johnson* to the plaintiff.   As to the home in Milwaukee it was held that plaintiff had no interest therein and a conveyance thereof was refused.   An accounting on the part of *Johnson* for the rents and profits of the apartment property from January 1, 1916, was decreed.   From the judgment so entered defendant appeals.

For the appellant there were briefs by *Hoyt, Goff &*

*Morgan* of Milwaukee, and oral argument by *Frank M. Hoyt.*

For the respondent there was a brief by *Hammersley, Barry & Torke,* attorneys, and *Charles E. Hammersley,* of counsel, all of Milwaukee, and oral argument by *Charles E. Hammersley* and *Norton A. Torke.*

OWEN, J.  The principal question presented is whether the finding of the court that the defendant holds title to an undivided one-half of the apartment property as trustee for the plaintiff is against the clear preponderance or great weight of the evidence.  It being conceded that in the beginning the defendant held an undivided one-half interest in the dock property as trustee for the plaintiff, it devolves upon him to show by clear and satisfactory evidence that his trusteeship was terminated.  *Ludington v. Patton,* 111 Wis. 208, 86 N. W. 571.  The evidence on the part of the defendant tends to show that in 1896 there was an express oral agreement between plaintiff and defendant that if the defendant would support and care for the plaintiff during her lifetime she would give to him all of her property; that the defendant promised so to do, and that thereafter both parties regarded the property as the sole property of the defendant, and the defendant faithfully carried out his part of the agreement down to the time plaintiff left their home in 1915.

Defendant was the only witness to testify to this agreement.  His testimony, however, has the following corroboration: numerous witnesses who were former friends and intimates of *Mrs. Blake* testified that at various times *Mrs. Blake* had informed them that she had given all of her property to *Johnson;* that he was entitled to it; that he was her best friend and that she regarded him as her adopted son, and that he would support her and care for her as long as she lived.  It appeared that *Johnson* had borrowed some

three or four thousand dollars from one James A. Bryden. James W. Bass, Esq., was attorney for James A. Bryden. Bass suggested to Bryden that there ought to be security for the loan. *Johnson* offered to execute a mortgage on the dock property as security. Some question was raised as to whether he owned the dock property even though at that time the record title stood in his name. He gave assurances that, although at one time he held an undivided one-half thereof as trustee for *Mrs. Blake,* she had turned the entire property over to him. Mr. Bass felt that there should be a quitclaim deed from *Mrs. Blake* to *Johnson* of her interest in the property to show that the trust character of *Johnson's* title had been extinguished. Mr. Bass testified that *Mrs. Blake* and *Mr. Johnson* came to his office, where she executed a quitclaim deed of her interest in the dock property, which deed was introduced in evidence and was dated August 30, 1899. Mr. Bass testified that *Mrs. Blake* said that she intended *Mr. Johnson* to have this property; that it really did belong to him; that he paid out a great deal of money on it and might as well have a deed of it now as to wait until later on when she was gone or something of that kind. She said she wanted him to own the whole property and take care of her and have no more bother with it herself, and she knew just what the deed was and she signed it and acknowledged it, and when it was finished Mr. Bass delivered it to *Mr. Johnson.*

It also appears that in June, 1902, *Mrs. Blake* went to Frank M. Hoyt, Esq., and executed a will leaving all her property of every kind, nature, and description to *Martin Johnson,* reciting therein as follows:

"The said *Martin Johnson* has been my support for nearly twenty years past; has expended freely his money and has been largely instrumental in securing for me my property, and I thus give him all of my property, partly because I desire to recompense him for such support, expenses, and

services as far as I can in a pecuniary sense and partly in recognition of the unfailing kindness with which he has always treated me. So far as my children are concerned, I think they are in such circumstances as renders it unnecessary for me to leave any part of my property to them, but in any event, considering the amount of property of which I shall probably die the owner, I feel that the claim of said *Martin Johnson,* for the reasons above given, is superior to that of my children."

By the terms of the will *Martin Johnson* was made the sole executor thereof.

The plaintiff denied that there had been any agreement between her and *Johnson* whereby she gave to him her property in consideration of her support during her lifetime. She claimed that she was cajoled into signing the quitclaim deed because *Johnson* said it was necessary in order to enable him to procure a loan, and that if it were executed it would never be placed on record, and that he would return it to her. She also testified that the will was not her free and voluntary act; that it was made in order to avoid fighting with *Johnson,* and that, as drawn, it did not express her desires. She was eighty-three years old when she testified, and of her testimony the trial judge said:

"I am satisfied that *Mrs. Blake's* mind in her later years had become to some considerable extent impaired—that is, her memory; and I am not willing to say that she intentionally testified falsely, but in view of several of her statements, which are clearly contradicted by the records in this case, it is perfectly evident that her memory is not trustworthy."

There is another circumstance which it is urged is inconsistent with the idea that the execution of the quitclaim deed in 1899 was for the purpose of vesting *Johnson* with the full title to the dock property. It appears that in June, 1902, *Mrs. Blake* conferred with Frank M. Hoyt, Esq., concerning some business matter, and that, as incident thereto, she and Mr. Hoyt went to Chicago and there conferred

with the attorneys who represented her in the Chicago pro-
ceedings by which title to the dock property was acquired.
The subject of that conference is not clear. Mr. Hoyt said
that it had passed completely out of his mind. His books
and records indicate that there was such a conference and
also indicate that he and *Mrs. Blake* went to Chicago, but
his mind is a blank so far as the subject of the conference
or the object of the visit to Chicago is concerned. It is
argued on the part of the plaintiff, of course, that it must
have been with reference to the Chicago property. The
court disposed of this question as follows:

"As I view it, the crucial question is whether or not the
plaintiff and the defendant, on or about the 30th day of
August, 1899, the day when the plaintiff executed a quit-
claim deed of the dock property to the defendant, the defend-
ant, as a consideration for the said deed, entered into an
agreement to maintain and support the plaintiff during the
balance of her natural life. The defendant contends that
there was such an agreement. The plaintiff flatly denies
that there was any such agreement. It is conceded that the
defendant at the time stood in a fiduciary relation to the
plaintiff; that the plaintiff reposed the utmost confidence in
him; it was all the property which the plaintiff owned or'
in any wise possessed, and the title thereto had always been
in the defendant. It is not contended that there was any
other consideration. There is nothing whatever to support
the defendant's contention except his own testimony and the
testimony of certain witnesses as to the statements made by
*Mrs. Blake* at different times.

"I think it is clear that a court should not sustain any such
claim on the part of the defendant upon his own unsupported
testimony, and it should not be, in my opinion, sustained
upon the testimony of witnesses who endeavor, after the
lapse of many years, to relate conversations in respect to
matters regarding which they had no personal interest.
There is testimony of witnesses as to the statements of *Mrs.
Blake* to the effect that she had given the defendant all her
property. There is also testimony as to statements made
by her which are utterly inconsistent with such a fact. The
strongest testimony to support the defendant's contention

is the testimony of Mr. Bass, but I can't bring myself to believe that such an agreement was entered into in view of certain other undisputed and unequivocal facts, which I will briefly mention."

He then refers to the drawing of the will and the trip to Chicago, from which it is argued that if the quitclaim deed of 1899 had divested *Mrs. Blake* of her title there would have been nothing for her to will and no occasion for the Chicago trip.

It becomes our judicial duty to review the evidence in this case from its every aspect in order to determine whether this conclusion of the trial judge is against the clear preponderance or great weight of the evidence, as the conclusion cannot be disturbed unless that appears. We undertake this task feeling that we are more nearly on a footing with the trial judge than usual in judging the veracity of witnesses, as the testimony of the plaintiff and the witness Bass was submitted in the form of depositions, and in view of the further fact that numerous outstanding considerations which we deem quite persuasive are undisputed. The testimony of *Johnson* is positive that the agreement to support was made and that the quitclaim deed of 1899 was executed for the purpose of carrying out that oral agreement. The testimony of Mr. Bass is equally plain, straightforward, and trustworthy. We feel that the trial court treated the testimony of Mr. Bass all too lightly. There is nothing in the case to indicate that his testimony was actuated by any bias, prejudice, or favoritism. It does not appear that he ever acted as counsel for *Johnson* or that he ever had more than a passing acquaintance with him. In giving weight to his testimony we must bear in mind that, so far as this transaction is concerned, he was serving neither plaintiff nor defendant, but his client, who had loaned money to *Johnson*. He was interested in obtaining security for that loan. It is apparent that, so far as the record title was concerned, the quitclaim deed added nothing to the title which *Johnson*

already had.   As a lawyer representing the interest of his client ·he must have been satisfied that the transaction operated to relieve *Johnson's* title of any doubt or suspicion which his prior trusteeship cast upon it.   Had he not been so satisfied he would have requested *Mrs. Blake* to join with *Johnson* in the execution of her mortgage, which she no doubt would have done as willingly as she executed the quit-claim deed.   In view of this transaction, in view of Mr. Bass's testimony with reference thereto, and in view of the interest which Mr. Bass had in obtaining a safe security for his client, we cannot brush aside his testimony as lightly as did the trial judge.

We also feel that the testimony of the many witnesses who testified to their intimacy with *Mrs. Blake* and of her numerous declarations to the effect that she had given all her property to *Johnson* and that *Johnson* would support her as long as he lived is entitled to rather greater weight than was accorded by the trial judge.   These witnesses were all intimates of both parties, frequent visitors at the home, and to whom the real relations existing between the parties were of at·least natural interest.   These declarations on the part of *Mrs. Blake* tended to fix in their minds the real relations existing between them, and it is not at all surprising that they were able to recall the declarations of *Mrs. Blake* tending to fix the relations of the parties between themselves and their common home.   But, in addition to this testimony, we feel that the lives of these parties speak more convincingly than their testimony or the testimony of witnesses.   The relations between them were most unusual; that there was sincere devotion between them cannot be doubted; that they were happy in their home and in each other's society is un-contradicted.   When the plaintiff, eighty years of age, left the home, the defendant wrote her most appealing letters imploring her return and revealing in no uncertain way a sincere yearning for her society and company.   They were

refined and cultured.   They were widely read.   Their library contained a wealth of literature.   There was a mutuality of interest. · It apparently afforded the defendant sincere pleasure to provide for her wants and minister to her fancies.   There is every reason to believe that this feeling on his part was fully reciprocated by her.

Although it cannot be said that the defendant was a strikingly successful business man, from the very start he managed her individual and their joint affairs. · He collected the income arising from their joint Chicago property and devoted it not to his individual but to their mutual comfort and sustenance.   His individual earnings, and they were by no means inconsiderable, were devoted to the purchase and maintenance of the home.   To all this she acquiesced.   To matters of business judgment she gave not a thought.   He was never asked for an accounting.   She had charge accounts at the principal stores of Milwaukee and bought what she wished.   Her accounts were paid by *Johnson.* They lived rather lavishly, no doubt beyond their means, and in doing this. they were mutual transgressors.   To be sure, the bearing of these facts upon the issues of this case may be that of a double-edged sword.   It removes any doubt whatever as to the trust and confidence which the plaintiff reposed in the defendant.   On the other hand, it reveals a situation and a relationship between the parties that strips the alleged agreement to support of every element of improbability.   Such agreements spring from just such relations.   She reposed in him not only trust and confidence, but entertained towards him the deepest feelings of gratitude, clearly revealed in the recitals of her will, a gratitude far beyond that which she entertained for any of her children.

So we have here a situation where the agreement was a most natural one, where the alleged terms were most faithfully carried out by the defendant down to the time of her abandonment of the home—prompted not by a sense of duty

but by natural impulses—a regard and affection in which he held the plaintiff, a regard and affection which restrained him from entering into marital relations and which prompted him to dedicate his income and his life to plaintiff's comfort and pleasure; a regard and affection which prompted him to plead for her return even after she abandoned the home. The making of this agreement is supported by the positive testimony of defendant, by the testimony of numerous witnesses concerning the declarations of *Mrs. Blake*, and the clear and unequivocal testimony of Attorney Bass. Opposed to it is the concededly unreliable testimony of the plaintiff, the circumstance of the making of the will, and the trip to Chicago. We do not regard the execution of the will as inconsistent with the making of the agreement. We are satisfied that *Mrs. Blake* was apprehensive that her own children might make *Mr. Johnson* trouble after her death. That such a possibility was not fanciful is manifest by this very action. This action might have been maintained by her heirs as well as by the plaintiff, and the making of the will was a cautious provision against such an eventuality.

The consultation with Mr. Hoyt and the trip to Chicago would be more difficult of reconciliation with an intent on the part of *Mrs. Blake* to pass title by the quitclaim deed of 1899 if it were clear that the consultation and the trip was concerned with her property. But it must be conceded that the object of the consultation and the trip is exceedingly hazy, and the conclusion that it did have reference to the property here involved must rest upon inference rather than upon substantial testimony. We are fully persuaded that the evidence on the part of the defendant entirely meets the burden cast upon him of proving by clear and satisfactory evidence that his trusteeship in the Chicago property was terminated by the quitclaim deed of 1899.

While we trust that the equitable considerations have not unduly influenced us in impartially weighing the evidence, we are prompted to say that this result is in keeping with the

justice of the case.   Throughout the years her children showed no great concern for their mother or her welfare. The daughter who persuaded her to leave her home in 1915, though financially able to make a trip around the world, had not seen her mother to exceed a half dozen times from 1899 to 1915, and upon two of these occasions the mother journeyed once to Rochester, Minnesota, and once to North Dakota to meet her.   The righteous concern of the children in their mother's welfare seemed to have been aroused in her old age, when she was more susceptible to influence and when heirship was imminent.   We fully approve of the nineteenth finding of the trial court "that the plaintiff never at any time before leaving the home of the defendant in Milwaukee expressed dissatisfaction with the conduct of the defendant towards her in respect to his management and control of her said property, and except for the influence of her said daughter and officious friend would no doubt have continued to live with him."

The respondent seeks a review of that portion of the judgment which decrees to the defendant title to the Milwaukee home.   In view of what has been said, it is apparent that this portion of the judgment meets with our approval, and no further discussion thereof is necessary.

*By the Court.*—Judgment reversed, and cause remanded with instructions to dismiss plaintiff's complaint.